HERGET, Judge.
Francis Connor, a minor, instituted this suit against Defendant, Aetna Casualty and Surety Company, the workmen’s compensation insurer of Crown-Zellerbach Corporation, for injuries allegedly sustained by him on October 19, 1959 while employed in Crown-Zellerbach’s paper mill. The suit arises under the Louisiana Workmen’s Compensation Act, LSA-R.S. 23:1021 et seq.
An exception to procedural capacity was filed by the Defendant, and Plaintiffs, F. R. Connor and Mrs. F. R. Connor, the father and mother of young Connor, were substituted as Plaintiffs on behalf of their minor son.
Following the trial on the merits the lower court rendered judgment holding that young Connor was totally and permanently disabled as a result of the alleged accident, awarding him compensation as for total disability, and fixed the expert witness fees of the doctors and of the court reporter. From this judgment Defendant appealed.
There is no dispute as to the Claimant’s employment; the hazardous nature of his employment; the injury in the course and scope of his employment, or that the rate for any compensation due him would be fixed at $35 per week.
The question to be resolved, therefore, relates to what, if any, disability Claimant had or has subsequent to October 31, 1959, the date to which he was paid workmen’s compensation, was discharged by his attending family physician, and returned to Crown-Zellerbach seeking employment in another capacity not because he was complaining of pain which would prevent him from performing the duties he was doing at the time of his injury but because of his desire to obtain a position where he would not be around machinery and would not be under direct supervision.
Plaintiffs allege that his injury to his back, plus a resultant traumatic neurosis, have caused young Connor to be permanently disabled. Defendant, on the other hand, while admitting the alleged accident, contends the injury incurred was only of a temporarily disabling nature and if in fact he is suffering from a neurosis, which is denied, same was not caused by the accident occurring on October 19, 1959.
Young Connor was employed on October 5, 1959 at Crown-Zellerbach and was undergoing training for the job of reel handler when on October 19, 1959, the first day of his third week of employment, he sustained the injuries complained about. Among the duties of a reel handler is, in the event the paper is torn or broken before a spool is filled, to tear away the torn paper and restart filling the spool by flipping the paper over the rollers, It was while performing this maneuver that young Connor was pulled onto the roller and he suffered severe abrasions and contusions to his back and buttocks when he came in contact with a portion of the machinery which applied clay to the paper.
Mr. Tietz, who was Connor’s foreman, testified that while young Connor was undergoing training as a reel handler he had noted he was a rather timid, insecure individual, afraid of machinery, and noticeably embarrassed by questions from his superiors, and he had concluded for that reason to change Connor to a position in the laboratory where his work was more or less unsupervised, but that Connor sustained the injuries prior to the time arrangements could be made for his transfer.
In describing how the accident happened young Connor testified, at page 109:
“Q. I believe you said on the day you got hurt, that you was pulled on *487 top of a roller, or reel, was it not? A. Yes, sir, I was pulled between a roller and this other place where they put clay on the paper.
“Q. You were laying kind of on the roller and you was pulled between it and this other device, is that what scraped the skin off of your rear end? A. Pretty much so.
“Q. You didn’t fall to the floor or hadn’t gotten thrown up against the wall, or anything like that ? A. I was pulled through the roller by my hands and then down against this place — I don’t know exactly how to describe it— I was thrown between the roller. — ■
“Q. Was it over, under, or beside the roller, that you were pulled into the roller ? A. Over the roller.
“Q. You were laying more or less horizontal, and was scraped between the roller underneath you, and something'above you? A. Yes, sir, they were pretty much on the same level, I would say.
“Q. But you didn’t fall to the floor ? A. No, sir.
“Q. It was a matter of being pulled out and laying over the roller, wasn’t it? A. Well, the roller caught my hands and threw me over between the roller and this place where they apply the clay.
“Q. That was backwards, or forwards, or sideways from where you had been standing? A. I don’t know exactly how I ended up.
“Q. How did you start off? Where were you in reference to the roller? A. I was pulled in by my hands.
“Q. Where were you with respect to the roller you were pulled in by? Were you standing in front of it looking at it? A. Yes, sir.
“Q. And you went on in over on your stomach when you were pulled into it? A. I am not too sure exactly. I just know I was pulled by my hands into it.”
Following injury, he was immediately taken to Dr. P. A. Niebergall in St. Fran-cisville who diagnosed his injuries as brush burns of both hips and left elbow. His treatment consisted of dressing the burns with Dyroderm and sulfathiazole cream. In addition, X-rays were taken and were found to be negative. Dr. Niebergall saw him only on this occasion. Subsequent to this diagnosis and treatment young Connor returned to the home where he was rooming in St. Francisville, called his parents who lived in Natchez, Mississippi, and they came and took him home. En route home the family stopped in Woodville, Mississippi to have him examined by Dr. C. E. Catchings, who stated in a deposition he had been the Connors’ family doctor and had treated young Connor since he was nine years old. On his examination of Connor on October 19, 1959 Dr. Catchings gave this answer:
“Pie stated that he was caught by rollers at the Zellerbach Mill which pulled off most of his clothes, and produced brushburns on the lateral aspect of his buttocks, and general body contusions. * * * I gave him Penicillin and Tetanus Toxoid.”
On October 26, 1959 Dr. Catchings again saw him and redressed the brush burns. Upon the request of young Connor’s mother Dr. Catchings checked a specimen of urine and found albumin present which he treated him for and said the condition was in no way connected with the alleged injury. On October 30 he re-examined his brush burns, checked the urine and found improvement, with only a trace of albumin present at that time. Pie again saw him on October 31 and concluded young Connor was fully recovered from his injuries and discharged him to go back to work. It was his testimony that he found nothing to prevent the Plaintiffs’ minor son from returning to his work. He further testified his records did *488 not reflect any complaint on the part of young Connor as to any back pain other than that caused by the brush burns, and if such complaint had been made to him he would not have discharged him to return to work. It, therefore, is apparent that Plaintiffs’ son did not complain of any back injury other than brush burns for which he was treated. While Dr. Catchings is not an orthopedist, he did check and found to be all right movement in his legs and gave him flexion and hyperextension tests, which resulted in his conclusion that Claimant’s back was not injured other than the brush burns. As heretofore noted, Dr. Catchings was and is as far as the record shows the family physician of the Connors. It appears to us most reasonable that had young Connor had any other complaints he would have freely discussed them with his family doctor. Moreover, because of the close relationship, if there had been any doubt in Dr. Catchings’ opinion as to the disability of young Connor he would have most assuredly satisfied himself there was no disability present which would prevent young Connor from returning to work with Crown-Zellerbach.
Upon his return to Natchez, several days after the date of the injury and before he was discharged by Dr. Catchings to return to work, he was seen by Dr. A. M. Read of Natchez, who testified he changed a dressing on some very severe abrasions he had on both sides of his abdomen and buttocks which he had received approximately one week previous to the time he saw him. At that time young Connor made no complaint to Dr. Read of any back injury other than the brush burns.
When Dr. Catchings discharged Connor to return to work on October 31 he returned to Crown-Zellerbach and, as he did not like to work around machinery, requested that he be given a job in the laboratory. He did not at that time complain of any physical inability to perform the work which he had previously been doing and made no complaints of any pain in his back. He had previously expressed a desire to get a job in the laboratory. At that time there was no opening or vacancy for his employment in the laboratory and Connor waited some five weeks — that is until November 22, 1959 when an opening developed — and he was re-employed by Crown-Zellerbach in the laboratory as a pulp tester which he performed for ten days. His duties consisted of obtaining samples of pulp in a bucket at the laboratory located on the second floor and walking up flights of stairs to the third and fourth floors carrying these buckets of samples. Connor testified the bucket was of a regular water bucket size. It is significant to us that if young Connor had sustained any serious injury to his back in the accident, certainly he would not have been able to go up and down the flights of steps without complaint of pain. As heretofore stated, Connor worked in the laboratory department for ten days without complaint of his inability to perform the work. The evidence shows he left this position with the company because he contracted bronchitis which was in no way connected with his duties or his previous accident. The evidence reflects on November 23, 1959 Connor was seen by Dr. A. M. Read who treated him for several days for an infection of the kidneys and bladder. Upon his developing acute bronchitis he was hospitalized on the 4 of December, 1959 by Dr. Read for that condition. Dr. Read testified this was in no way connected with any trauma.
Following hospitalization for the bronchitis, at the request of Dr. Read, Connor was seen by Dr. Sidney O. Graves, who is a specialist in urology, practicing in Natchez, Mississippi. Dr. Graves, in his examination and X-rays taken in connection therewith, found a condition he described as Polycystic Renal Disease, a congenital malformation of the kidneys manifested by the formation of numerous cysts, which enlarge in time until the function of the organ is destroyed. It was his opinion that the accident had in no way aggravated or had any adverse effect on the *489 condition of young Connor’s congenital disorder of the kidneys.
Dr. Jack H. Phillips, an orthopedic surgeon in Natchez, Mississippi, testified he saw Connor in his office for examination on December 4, 1959. Evidently there is an error on the part of either Dr. Read or Dr. Phillips as to the date, for Dr. Read had previously testified he had hospitalized Connor for bronchitis on December 4, 1959. However, regardless of the date, Dr. Phillips testified in giving the history of his injury young Connor told him:
“The patient stated that he was injured on October 19, 1959, while working for Crown-Zellerbach Company near St. Francisville, Louisiana. While he was freeing some paper his hand caught in the roller in some fashion and he was squeezed between the roller and part of the building, and causing injury to his low-back and hips; and he also stated that he was momentarily stunned or unconscious. He related because of the injuries he was seen and treated by Dr. Neber-gall of St. Francisville, Physician. When he came to me his chief complaints were persistent pain, soreness and stiffness in the back and hips.”
Dr. Phillips found there was mild tenderness and spasm of the muscles in the para-spinal areas and there were evidences of healed abrasions and contusion of the skin on the buttock and lumbar spine area. He also found a 50% limitation of motion in all directions of the lumbar spine. Pie diagnosed Connor’s condition as a liga-mentous soft-tissue sprain of the low back, producing a persistent pain, stiffness and discomfort in the low back. He prescribed a lumbar corset and recommended a firm bed, restriction of activity, avoidance of heavy lifting, and his remaining off work. On March 7, 1960, after having seen him periodically, Dr. Phillips discharged him.
In response to the following questions posed by the Court to Dr. Phillips, he replied :
“Q. You considered him well after March 7th though didn’t you Doctor? A. Yes.
“Q. A period of January, February and March? A. He was injured on October 19, almost 6 months.”
Dr. Phillips was of the definite impression Connor had informed him the reason he had left his job as laboratory assistant at Crown-Zellerbach was due to disability in his back, though the evidence shows his .reason for leaving was because he suffered an attack of bronchitis.
It appears from the history given by Connor to Dr. Phillips of stiffness in his back and pain therein, other than from the brush burns, Dr. Phillips would be influenced by that history in his diagnosis of Connor’s condition as a ligamentous soft-tissue sprain in the low back. However, it is to be noted, in addition to subjective complaints of pain in his back and limitation of motion, objective evidence of muscle spasm in the para-spinal areas were noted by Dr. Phillips. Dr. Phillips was of the definite, firm opinion any musculature involvement of the back which Claimant sustained from the accident, or which he felt could have resulted from the accident that took place on the 19th of October at Crown-Zellerbach Company, had disappeared, though he did state in his testimony Connor told him as follows upon his being discharged: “He told me on March 7 that he had been going to college, and that he was able to do that well, and the only complaint he mentioned was some soreness in his low-back after walking for long distances.”
When asked this question, he answered:
“Q. Could you state for how long, in your opinion, there was any actual disability? I assume it gradually diminished over the period you were *490 seeing him? A. I would say I considered him totally temporarily disabled until he was discharged.”
When young Connor left his job with Crown-Zellerbach upon being employed as a pulp tester in the laboratory on November 22, 1959 and after so working for ten days he did not return to his employment, but entered school at Southwestern Louisiana Institute (now University of Southwest Louisiana) in January, 1960 where he had attended the spring term the previous year. He attempted to obtain a part-time job to finance his way through school and though he made every endeavor to obtain a job he was unable to obtain employment, in consequence of which he returned to his home after about six weeks, in March, 1960. Upon his return to his home young Connor sought further employment but was unable to obtain a job until June 5, 1960, when he went to work on an offshore drilling rig as a cook’s helper and he was still employed as such on the date of the trial of this case, July 12, 1960.
Prior to his entering Southwestern his mother obtained an appointment for him with Dr. S. H. Wyatt, who is a psychiatrist practicing in Baton Rouge. Her primary concern was about his depressed attitude in relation to his scholastic endeavors. Doctor Wyatt supplied the only expert testimony in regard to the allegation that as a result of the accident at Crown-Zel-lerback Connor had possibly sustained a post-traumatic neurosis, tie first saw Con-nor on January 18, 1960 and saw him on two other occasions prior to the day of the trial of the case. He was of the opinion that while Connor had not sustained a traumatic neurosis, same had been successfully avoided by his encouragement to return to school and work. Though Dr. Wyatt expressed the possibility of some connection between the possible neurosis and his injury, he delineated other causes to which same could have been attributed. On the day of the trial he testified that he found remarkable improvement in Con-nor’s psychological outlook at that time and reiterated it was to the interest of young Connor to continue his employment and scholastic endeavors. He, however, when asked the specific question as to whether Connor would be able to return to the paper mill as a reel handler, said:
“A. That’s a little tough to answer. I would just have to hazard a guess. I would guess that he would suffer some pain. Certainly, the job that he has now seems to be less strenuous, as he describes it to me, than that what you just described; and he is experiencing pain at the end of a working day now. If he had a more strenuous job, he might experience more pain. I would have to hazard just a wild guess. I can’t say with any degree of certainty.
“Q. But bearing in mind with .reasonable medical certainty, he would have — -A. I think he would have pain.
“Q. He would have pain? A. Yes, sir.”
It is to be noted the witness, Alvin Tietz, who was Connor’s foreman when he was employed at Crown-Zellerbach, as herein-before stated described Connor’s physical condition prior to his injury in October, 1959 as not being agile, apparently stiff in the legs and back, and in .response to the question:
“Q. Did he walk with a gait any different from anyone else? A. Short steps, straight back, and he wasn’t very agile.”
He further related that Connor seemed to be scared of machinery and of authority, was lacking in confidence, quiet and did not mix with the other men too much. From this description of Connor, it appears prior to the date of this accident his nature was similar to that described by Dr. Wyatt. It thus appears Connor’s insecurity had manifested itself prior to the date of this accident on October 19, 1959, and especially is this view affirmed in considering Dr. Wyatt failed to testify *491 that Connor did in fact sustain a traumatic neurosis in the injury sued upon.
In his reasons for judgment the Trial Judge said he was impressed with the testimony of Drs. Phillips and Wyatt, both of whom he stated testified “ * * * that Francis Connor could not perform duties as a reel-handler without working in substantial pain.”
To the contrary, Dr. Phillips testified Connor had fully recovered from the low back sprain as of March 7, 1960. Dr. Wyatt testified Connor did not sustain a traumatic neurosis and only hazarded a wild guess if he returned to his job as a reel-handler he would experience some pain.
The jurisprudence of the State of Louisiana makes it clear that a plaintiff in a workmen’s compensation case must, as in other civil cases, bear the burden of proof and must establish his case by a reasonable preponderance of the evidence. Edwards v. Aetna Casualty and Surety Co., La.App., 108 So.2d 126; A. Squyres v. Western Casualty and Surety Co., et al., La.App., 107 So.2d 837; Page v. Tremont Lumber Co., La.App., 108 So.2d 1.
In our opinion, under the most liberal view of the facts presented and the medical opinions expressed, we conclude as a result of the injuries sustained by Connor on October 19, 1959 he suffered only, in addition to the brush burns, a ligamentous soft tissue sprain of the low back from which he had fully recovered on March 7, 1960.
For these reasons, the judgment appealed from is amended, decreeing total temporary disability to Francis Connor resulting from injuries sustained by him on October 19, 1959 while working for Crown-Zellerbach Corporation to exist through March 7, 1960; and it is ordered, adjudged and decreed that plaintiffs, Mr. and M-rs. F. R. Connor, are awarded judgment for and on behalf of their minor son Francis Connor against the defendant, Aetna Casualty and Surety Company, accordingly, in the sum of $35 per week from October 19, 1959 through March 7, 1960 together with interest from the due date of each installment until paid, subject to a credit of compensation previously paid by Defendant to Claimant. In all other respects the judgment appealed from is affirmed.
Judgment amended in part, affirmed in part, and rendered.